THOMAS PAIGE *et al.*

*v.*

OLGA GREENWALD HIERONYMUS.

*Opinion filed October 24, 1901—Rehearing denied December 5, 1901.*

1. PRACTICE—*effect of general remandment as to introducing additional evidence.* If a decree is reversed and·the cause is remanded generally, the lower court is concluded by the legal points decided, but may allow amendments to the bill and hear additional evidence.

2. CONTRACTS—*rule as to equity refusing aid to either party to a contract to compromise criminal offense.* If the object of a contract was to prevent or stifle prosecution for a criminal offense, equity will refuse its aid to both parties, with the exception that it may sometimes lend its aid where the parties are not *in pari delicto.*

3. SAME—*what must appear to justify equity in lending its aid· to less guilty party to an illegal contract.* To justify a court of equity in lending its aid to the less guilty party to a contract to compromise a criminal offense, it must appear that the complainant did not enter into the contract voluntarily, but that she was deceived or defrauded, or forced to make the contract through fear that the perpetrator of the offense would otherwise be convicted.

4. SAME—*when conveyances to secure money borrowed to settle defalcation will be enforced.* Conveyances made by an unmarried woman of mature years and ordinary intelligence, as security for money borrowed by her to settle with her affianced husband's employers for his defalcation, will be enforced in equity on cross-bill, where the evidence not only fails to establish the allegations of her bill that the conveyances were made under duress, for the purpose of stifling prosecution, but shows that she voluntarily entered into the transaction against the advice of her friends and attorneys and even her grantees, and after being repeatedly told by her affianced husband's employers that they could not and would not settle the criminal part of the affiair.

APPEAL from the Circuit Court of McLean county; the Hon. JOHN H. MOFFETT, Judge, presiding.

JESSE E. HOFFMAN, for appellants.

JOHN E. POLLOCK, and WILL & WHITMER, (MAYNE POLLOCK, of counsel,) for appellee.

Mr. CHIEF JUSTICE WILKIN delivered the opinion of the court:

This is a proceeding in equity, heard in the McLean circuit court on the bill of appellee, the cross-bill of appellants, Thomas Paige and wife, the answers thereto and replications, together with the proofs reported by the master. By his report the master found in favor of the complainant, and recommended a decree in her favor as prayed in the original bill. Objections to his findings were overruled, and renewed as exceptions to his report before the chancellor and again overruled, a decree being entered setting aside the deed and contract set up in her bill and dismissing the cross-bill. To reverse that decree this appeal is prosecuted.

The case was before us at a former term, upon a decree to the same effect, which was reversed and the cause remanded for another trial. A statement of the facts will be found in the opinion then filed. *Paige* v. *Hieronymus*, 180 Ill. 637.

Counsel for appellants is in error in supposing that the judgment of reversal upon the former hearing is *res judicata* as to the question of appellee being *in pari delicto* with the appellants. The reversal and remandment of the case did not preclude parties from offering further evidence as to that fact. The case was remanded generally. The circuit court was concluded by the legal principles decided, but might, as it did, allow amendments to the bill and additional evidence. *Henderson* v. *Harness*, 184 Ill. 520, and cases cited.

The law as to the rights of the parties to a contract or agreement to compromise a criminal offense, as stated in our former opinion, is, that where the evidence shows that the object of the agreement was to prevent or stifle a prosecution for a criminal offense, courts will refuse to lend their aid to either party, but will leave them in the position they have placed themselves. An exception to the rule is, that where the parties are not *in pari delicto*,

equity will sometimes relieve the less guilty party. These, however, are not cases in which the contract to compound the criminal offense is entered into freely and voluntarily, but where there is a feature of duress as to one of the parties. As stated in the American and English Encyclopedia of Law, (vol. 6, p. 416, 2d ed.): "But when the parties do not stand *in pari delicto*, and it appears that the contract or deed was obtained by duress, equity will not refuse its aid. Thus, when the inequality in the situation of the parties is such that it is apparent that the act was not voluntary, as, where one of the parties exacts a security which the other is driven to give in order to save one dear to him from exposure, disgrace and ruin, equity will set aside the contract or deed so obtained." (*Williams* v. *Bayley*, L. R. 1 H. L. 200; *Foley* v. *Green*, 14 R. I. 618; 51 Am. Rep. 419; *Coffman* v. *Lookout Bank*, 5 Lea, 232; 40 Am. Rep. 31.) In these and similar cases the reason for holding that relief may be granted to one of the parties notwithstanding the fact that a criminal offense has been compromised is, that the party seeking the relief has been induced to enter into the contract through fear or by surprise, or upon a sudden disclosure of the fact that one in whom he is deeply interested is charged with the commission of a crime and may be subjected to conviction and punishment unless he enters into the contract. In all such cases relief is granted not so much because of the illegality of the agreement as compounding a crime, as because it is involuntary on the part of the one seeking to avoid it; and if the decree below in this case can be sustained, it must be upon the ground that the complainant in the original bill was induced to make the contract and execute the deed set up in her bill through some misrepresentation, fraud, mistake or duress,—through fear that her intended husband would otherwise be prosecuted and sent to the penitentiary. In this sense, after a careful review of the evidence appearing in the new record, we are still of the

opinion that there is no sufficient ground for the conten-
tion that the complainant was not equally guilty with
the defendants in the compromise of the criminal offense,
if such a compromise had been made.   It cannot be said
with any degree of earnestness that she was deceived or
defrauded, or forced to make the agreement through fear
that Charles Whitney would otherwise be convicted.

The crime with which Whitney was charged was com-
mitted in Cleveland, Ohio, early in the month of May,
1893.  He immediately fled the country.  Soon after, she
met him at Riverside, California, and talked to him, ac-
cording to her statement, about one hour, but whether
in that conversation she learned of his criminal conduct
she does not say.  She says she left California soon after
this meeting and came directly to Bloomington, her for-
mer home.  From there, on the 27th of the same month,
she wrote to Daykin Bros., (the parties defrauded,) stat-
ing that she had learned of Whitney's conduct, and re-
ferring them to several of his relatives, saying, "I thought
perhaps you would like to see some of them," and asking
for a full statement of Whitney's defalcation.  During
that summer she went to Chicago to attend the World's
Fair, and while there met Mr. A. G. Daykin, of the firm
of Daykin Bros., and had a conversation with him about
Whitney and the crime with which he was charged, and
she says that she went to Cleveland at his suggestion,
made in that conversation.  Arriving at Cleveland about
the third day of July, she visited several of Whitney's
relatives, soliciting them to aid her in bringing about
a settlement of his difficulties, but failing to receive en-
couragement from them she called upon an attorney,
Mr. F. C. McMillan, and through him and by her own per-
sonal appeals to the defendants, Thomas Paige and wife,
finally succeeded in making the contract set up in her
bill.  This contract was not consummated until October
3, 1893.  During all that summer she was negotiating this
settlement.  The testimony of numerous parties residing

in the city of Cleveland is to the effect that they advised her not to enter into the agreement. During this time Whitney was out of the country and his whereabouts unknown to everybody, unless she had knowledge of it. Giving due weight to the fact that she was greatly attached to him and was earnestly solicitous about his security from arrest and punishment, it cannot be said with any degree of seriousness that she was during all this time under duress,—and that, in the face of the fact that she was not only at liberty to consult with her attorney and friends, but that she did so, and chose to act independently of and contrary to their advice.

Mrs. Medora Paige, made her own witness, testified: "I told her that I would not do what she was doing—that I would not sign my property away. She said she knew what she was doing; that she wanted to borrow the money, and wanted to borrow it of us if we would lend it to her."

L. K. Coffenberry testified that she came to his office in Cleveland and showed him a paper from Whitney authorizing her to take possession of any of his property, and that he turned over to her a fifty dollar note and a great many of her letters which Whitney had left with him. She then told him she was "going to get the matter settled if she could, and was going to see Daykin Bros." A few days later she told him "Daykin Bros. would not listen to a settlement and she did not think she could settle with them; said she had been to see Tom Paige; that Whitney had told her Tom Paige was the best friend he had in the city; she told me that Charlie had probably spent some money foolishly on her; that she felt sorry for him, and that she was going to help him out if she could." She does not deny this conversation.

C. N. Collins was asked to go with her to the office of her attorney to examine the papers which she was about to and did execute. He testified that he told her "if she wanted to convey her rights and interests, all she had

to do was to sign those papers. I tried to dissuade her. * * * I said to her, 'Olga, why do you do this? Why are you conveying away your property? What object have you?' 'Well,' she says, 'Mr. Whitney has got into trouble and probably has spent money on me to give me a good time and I feel like making the matter straight,— feel like helping him out of the trouble.' 'Why,' I says, 'I would not do it, under the circumstances, unless I was married to him.' She replied, 'I am as much married to him now as I ever will be.'" When asked, on cross-examination, what she meant by being married to him as much as she ever would be, he said: "She simply made the declaration and I drew my own inference. I said to her, 'You are then married now, or you wouldn't do what you are doing.' She made no reply to that, that I recollect." He further testified that on the way to the attorney's office, on the street cars, he conversed with her about the policy of her course and advised her against signing the papers. This conversation is also undenied by her.

Thomas Paige, in his deposition, says that he and Whitney were close and intimate friends,—members of the Uniform Rank K. P.'s; that they spent a great many nights together; "our friendship was more than ordinary, owing to the fact that he had done me a certain favor. I learned soon after he left Cleveland of what was claimed against him. About six weeks after that Miss Greenwald came to me and stated that she had received a letter from Whitney directing her to come to me, as of all other persons I would be the most likely to assist him, and also to have me request my friends in the K. of P. order, as well as his friends, to assist in getting it, so we could make a settlement. * * * I met her in my office the following Monday and heard her statement as above, and afterward tried to interest our friends along the line indicated, but met with little success, owing to the money market. For a long time, almost every Mon-

day after that she visited my office. At first she had no definite plan, but afterwards she told me that she first thought she could raise enough money to make good the defalcation from Whitney's relatives, but without success. She then wished me to loan her the money. She got a statement from Mr. Whitmer, her guardian, stating what property she had in Bloomington, and told me if she could raise $6000 she thought that that would be sufficient to make good the loss to Daykin Bros."

Glucus W. Collister, also of Cleveland, an attorney at law, testified: "I called at the office of Mr. McMillan, who was acting as this girl's attorney, to examine an abstract and a will, so as to pass on the question for my client, Mr. Paige. I was there several times, and there was one time when Mr. McMillan had to be out of the city that I was sent for to come to the office of Dickey, Estep, Carr & Goff, attorneys, in the hands of one of whom Mr. McMillan had left Miss Greenwald's affairs while he had to be away. Mr. Carr was to draw up the papers for her to sign to convey her property to Mr. Paige to secure him for advancing the money to her that was owing to Daykin Bros. She explained to Mr. Carr what she wanted done, and I told Mr. Carr what I knew about the transaction, as far as it had gone; that this fellow was a defaulter and had been a book-keeper for Daykin, and this girl was anxious to get him out of trouble; that Daykin had told her, in my presence, that if Paige paid him money, or anybody paid him money, he would not in any way compromise the criminal matter; that that was in the hands of the prosecuting attorney, and he would have nothing to do with it. I told Carr that was the attitude—that I had heard Daykin tell her that in McMillan's office. Carr then told her she was very foolish to make any such conveyance of her property. She said she knew what she was doing, no matter what he thought of it, and he advised her not to do it, and finally said, if she persisted in doing it she would have to get some

other lawyer,—that he would not do it,—and we came away.   In McMillan's office I heard Daykin advise her several times not to make this conveyance; that she was very foolish to do it; that she was unmarried to this man, and if she paid out her money for him and he came back to America he probably would throw her over and not have anything to do with her."   This testimony is uncontradicted by her.

Francis C. McMillan, her attorney, testified: "I acted as attorney for Miss Greenwald in 1893 in the transaction in which she conveyed her property to the Paiges. I had not met her before then.   She came to my office and introduced herself and stated her business, and I took charge of it for her.   The first thing she wanted me to do was to raise money, or assist her to raise money, from the relatives of Mr. Charles Whitney to pay up some defalcations he had made from the Daykins.   I did what I could with these relatives.   I saw a number of them.   I sometimes went with her and sometimes alone.   I found the relatives pretty well fixed—some of them considered rich.   The ones I saw were fairly wealthy, but they would not pay enough to pay up the defalcation.   Before going to see these relatives I went to the Daykins with a skilled book-keeper, and we went over the books and figured it over and arrived at about $10,000.   Then I began negotiating with the Daykins, who were claiming a loss of about $10,000, and we finally got to an agreement that they would accept $6000 in settlement of the defalcation. Now, when I say in settlement of the defalcation, I mean merely the civil branch of the matter, as I had told Miss Greenwald under our State statute the criminal branch of the defalcation could not be settled; that it would be termed compounding a felony, and that she and I and all others who participated in such a thing would be liable to severe punishment, and that all that could be settled would be the paying back of the amount of the defalcation, or what the Daykins would take for the amount

that they claimed that Whitney had defaulted of them. I received the letter marked 'Exhibit 7,' from Daykin Bros., and made the settlement on the terms mentioned therein. I showed my client the letter. I showed her everything. The letter is as follows:

"'CLEVELAND, OHIO, *August 24, 1893.*

"'*Mr. Frank McMillan, Attorney, Society of Savings Building, City:*

"'DEAR SIR—Brother Mark tells me that he had a meeting with you and that you represent Mr. Whitney and Miss Greenwald, and you want to settle Whitney's account with us for them. Miss Greenwald was in to see me several times and she also sent a gentleman friend, and I told them both that I would do nothing in regard to taking her property and we would make no arrangements not to prosecute Whitney. We will take the $6000 in cash you say that his friends will pay, and give you a receipt in full for Whitney's account with us. Before we take it, however, we want you to go over the books with the experts and satisfy yourself, for your clients, that they are getting a big cash discount on the amount he owes us. We cannot settle the criminal part of the account.

"'Yours respectfully,

A. G. DAYKIN, for Daykin Bros.'

"She wanted the criminal prosecution stopped, and I told her emphatically that my standing as an attorney at this bar would not permit me to participate in such a thing as the compounding of a felony or compromise of a crime; that I could not do it; that if she wanted anything of that sort done she would have to employ some other counsel; that I could not jeopardize my standing in that regard, and I told her how utterly useless it was to try a thing like that. After I had failed to get the money from Whitney's relatives, Miss Greenwald proposed to give security on her Bloomington property if we could find a loan. Several people were suggested,— among others, her brother-in-law here,—and finally she told me she had found a man by the name of Paige, whom I had never seen or known. I urged her not to encumber her property, but things went on until she had perfected her general arrangements with Mr. Paige, when

she brought him to me to have the papers made out and details attended to. About this time she wrote me the letter, as follows:

" 'BROOKLYN VILLAGE, O., *Sept. 28, '93.*
" '*F. C. McMillan:*

" 'DEAR SIR—As I wish to leave the city in a very few days I wish you would close up the matter as soon as possible. See if Mr. Daykin has received those abstracts and what Mr. Paige will do, and also that Mr. Daykin will stop all further proceedings. The agreement between Mr. Paige and I is, that I have the use of my income for two years, for the reason I have drawn that money for that length of time, and that I am to have six years' time to pay this in, first payment to be made two years from date, and that at any time I have the right to sell my bank building share to my sisters, and the same to apply as payment, and until the six years are up he has no right to sell or transfer my property in any shape or manner. The interest to be paid yearly, after the first two years. The payments are to be divided equally. He is to give me a deed in return; at the end of six years will be delivered to me, and if I should die, my sisters have the right to recover my property at face value; that Peter Whitmer will control my property just the same as it was before, as it is understood the deed is only given as security.

"I trust, Mr. McMillan, you will work to my interest in this matter, and if there is any danger of Charlie being brought back here you will tell me so. Have you been able to get that money? The matter must be attended to at once, for I must leave the city within the next five days.

" 'Very respectfully,     OLGA GREENWALD.'

"I then refused to act for her further until she should submit the matter to her relatives and friends, and requested her to bring some one in to me for a conference. She brought a Mr. Collins, whom till that time I had never known, and we both together urged her not to go ahead and tie up her property as she proposed, without avail, and I then told her to deliberate longer over the matter and see if she couldn't come to the same conclusion he and I had. After that, she and I had several talks about the matter, in which I kept holding up to her the danger of her losing her property. I told her that a man

that would steal $10,000 while he was engaged to her was not a fit man for her company, but I could not change her purpose. She would always reply, 'I love that man; I am going to fix this matter up for him.'"

This testimony would seem to establish, beyond all controversy, that complainant voluntarily and persistently pursued the matter of making the contract and was satisfied only when she had accomplished it. We have searched in vain for evidence tending to discredit any of these witnesses, unless it be the interest of Paige and A. G. Daykin in the result of the suit, and possibly the professional pride of McMillan. It is noticeable that throughout her testimony she does not deny the statements of either of these witnesses, except as to the consideration for the agreement. We also find that in her correspondence with Mr. McMillan, her attorney, while she was with Whitney in Honolulu, as late as October and November, 1895, she speaks of the contract and shows no disposition to repudiate it.

It is claimed that immediately upon Whitney's flight from Cleveland, Daykin Bros. began to search for him. On May 14, 1893, complainant was at Los Angeles, California, and she says she received a telegram, saying:

"If you go to Kansas City get our letters at Hotel Victoria.
                                        DAYKIN BROS."

She says she also saw a telegram to a friend of hers, as follows:                                *"May 12, 1893.*

"Telegraph us at once where dispatch will reach Olga Greenwald.                                        DAYKIN BROS."

As before stated, A G. Daykin met her in Chicago, and the testimony of Miss Botfield tends to prove that he sought her for the purpose of getting her to settle Whitney's defalcation. He testified that they sent the telegrams for the purpose of locating Whitney, and that he went to Miss Botfield because he understood she was a go-between to carry correspondence between Whitney and Miss Greenwald, and that he sought information

from her as to the location of Whitney, and not of Miss Greenwald,—that he already knew where she was. Whatever may be said as to the truthfulness or plausibility of his explanation of these matters, it cannot be seriously contended that the dispatches, or anything he did or said in Chicago in July, 1893, could have operated upon her mind in October of that year to coerce her into making the contract. It will not do to say she was feeble in health and inexperienced in business. Her letters, conversations and conduct show no want of mental capacity whatever. There is to our comprehension no element of duress in the case. In fact, she does not claim there was. Therefore, on her theory that the agreement was that Whitney should not be prosecuted, she was equally guilty with the defendants and can have no equitable relief.

If the consideration for the contract was the compounding a felony or crime, it would be equally clear that no affirmative relief could be had in favor of the cross-complainants. We have, however, reached the conclusion that the proof also fails to establish that fact. It being shown that the contract was free from fraud, mistake or duress, a *prima facie* case was made upon the cross-bill by the introduction of that contract. A part of the testimony already set forth bears directly upon this branch of the case.

Counsel for the appellee say in their argument that Whitney's defalcation amounted to no more than $4000, whereas a payment of $6000 was demanded by Daykin Bros. But we think the evidence shows the loss amounted to $10,000. Mr. Al. Daykin, as well as the attorney who acted for the complainant, testified that the result of an examination of the books and accounts in the office of the firm showed that not less than $10,000 had been embezzled by Whitney.

There can be no doubt that Daykin Bros. might lawfully receive the money embezzled from them, from Whitney or anybody else, provided they did not do so with

the promise or agreement that they would not prosecute the thief. It is true that the complainant was under no legal obligation to pay that money, but she certainly had the right to do so if she voluntarily so desired. We do not doubt, from all the evidence, that in her persistent efforts to raise the money and satisfy this claim she was prompted by the motive that if she succeeded there would be no prosecution of the criminal charge against Charles Whitney; but unless that hope or expectation was based upon some promise or stipulation upon the part of the Paiges or Daykin Bros. the court is powerless to afford her relief. Nor can the court arbitrarily accept her statement as to the agreement, without reference to the contradictory evidence of other witnesses. The burthen of proof is upon her to prove what she has alleged as to the illegal contract. In her own testimony she says: "I executed all the papers there in that office at the same time. The consideration moving to me was, that if I signed those notes and deeded my property over to the Daykins that they would not prosecute Charlie Whitney. That was the only consideration I received. The matter of Charlie Whitney not being prosecuted was talked over between Paige and Daykin and Mr. McMillan several times,—about making settlements,—and they said if a settlement was made that Daykin Bros. would not prosecute Charlie Whitney. Most of the conversation was held with Al. Daykin, but I talked it over with Mr. Paige also." She was asked, "How many times did you talk it over with Mr. Paige?" And answered: "Several times— eight or ten. I talked with Mr. Al. Daykin, Mr. Paige and Mr. McMillan about it. I asked for a statement in writing to the effect that Whitney would not be prosecuted, but Mr. Daykin and Mr. McMillan said they could not give it to me,—all they could give me was a verbal agreement,—but if they did not prosecute the State was not apt to do so." On her cross-examination, in answer to the question, "Were you not repeatedly told that they

would not and could not settle the criminal part of this affair?" she says: "I wasn't repeatedly told that. Mr. Daykin said if he did not push the matter the State was not apt to do so." And again she was asked, "Didn't Mark Daykin tell you that he could not and would not settle the criminal part of it?" and answered: "I don't remember. I do remember Mr. Al. Daykin saying that they could not settle the criminal part of it, but unless they pushed the case the State was not apt to do so."

Turning now to the testimony of Al. Daykin, Paige and McMillan, who she states told her that if she made the contract Whitney should not be prosecuted, we find in the deposition of Al. Daykin the following:

Q. "She says that you said in McMillan's office that you could not settle the criminal part of this embezzlement, but unless the fire insurance company pushed it the State would not do so unless you pushed it.

A. "I never made those statements. The only statement I ever made about the criminal part of this affair was in substance what I told her and her attorney,—that we would not and could not settle the criminal part. Nor did I indirectly lead her to think I didn't mean what I was saying. I was very particular about that,—even to writing it to her,—and there was never anything stated to her or sent her from me, by anybody, from which she could reasonably get the idea that we were in fact settling the criminal part while saying just the contrary."

In the letter of August 24, 1893, addressed to McMillan, her attorney, Mr. A. G. Daykin writes: "We cannot settle the criminal part of the account."

Thomas Paige in his testimony says in answer to the questions:

Q. "Miss Greenwald says that she talked over the matter with you several times about Daykins' not prosecuting Whitney if this money was paid.

A. "There was never any mention made of prosecution. It was purely a question to raise money to make

good the moneys he had spent.　I never talked to her or to McMillan on that subject.　*　*　*

Q. "She further charges that at the same time you agreed, in confederation with Daykin Bros., not to prosecute Charles Whitney or that he would not be prosecuted.

A. "The question of prosecution was never mentioned.

Q. "Did you ever have any such agreement with her?

A. "None whatever.　There was nothing said between her and me that could be construed by her to mean that, during my whole connection with this matter."

The testimony of Mr. McMillan has already been noticed.　In short, unless these three parties, Daykin, Paige and McMillan, have each and all committed willful and corrupt perjury, not only was there no agreement to compromise the criminal offense, but there was the most positive and unequivocal refusal so to do.　We are not unmindful of the fact that parties in matters of this kind may, and very often do, refuse to agree to an unlawful thing and at the same time by indirection lead the opposite party to believe the contrary; but we know of no rule of evidence which will permit a court to place a directly opposite construction upon the language used by witnesses when they say that there was no such agreement but a positive refusal to enter into any such an arrangement.

Unless it must be said that a party who has lost money by theft or embezzlement cannot contract with a third party to receive it back, however much he may protest against compounding or compromising the crime, we can see no escape for the complainant in the original bill,—and no one, we apprehend, will contend for such a rule of law.　Counsel for appellee endeavor in their argument to have her treated as an expectant heir, and to bring her case within the rules of law applicable to what are termed "catching bargains."　She is not an expectant heir, and the doctrine can have no application whatever to her case.

The conduct of this woman in her association with Whitney, an unmarried man wholly without manly instincts, and the sacrifice of all she had for him, shows how blindly a woman may become infatuated with a villain and to what extremes she will sometimes go to prove her devotion to him. However much courts may feel inclined to protect such persons against the consequences of their own folly, clearly established facts and well recognized principles of law cannot be ignored in order to do so.

After a careful consideration of the arguments of counsel and the evidence in this record we are convinced that the decree of the circuit court cannot be sustained. It will accordingly be reversed, and the cause remanded to that court with directions to dismiss the original bill and grant the relief prayed in the cross-bill.

*Reversed and remanded.*